UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NATALIE J.,

                                        Plaintiff,

v.                                                              5:23-CV-00692
                                                                  (DNH/ML)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.
_____

APPEARANCES:                            OF COUNSEL:


OLINSKY LAW GROUP                       HOWARD D. OLINSKY, ESQ.
  *Attorneys for Plaintiff*
250 S. Clinton Street, Suite 210
Syracuse, New York 13202

U.S. SOCIAL SECURITY ADMIN.             FERGUS KAISER, ESQ.
  *Counsel for Defendant*
6401 Security Boulevard
Baltimore, Maryland 21235

**MIROSLAV LOVRIC**, United States Magistrate Judge


## <u>REPORT-RECOMMENDATION</u>

Plaintiff Natalie J. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a final decision of the Commissioner of Social Security ("Defendant" or

"Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI"). (Dkt. No. 1.)  This matter was referred to me for Report

and Recommendation by the Honorable David N. Hurd, United States District Court Judge,

pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). (Dkt. No. 7.)  This case has proceeded in accordance with General Order 18.

Currently before this Court are Plaintiff's motion for judgment on the pleadings and Defendant's motion for judgment on the pleadings. (Dkt. Nos. 12, 14, 15.)  For the reasons set forth below, this Court recommends the District Court grant Plaintiff's motion for judgment on the pleadings, deny Defendant's motion for judgment on the pleadings, and remand the Commissioner's decision for further administrative proceedings.

## I.    **PROCEDURAL HISTORY**

On January 7, 2021, Plaintiff protectively filed applications for DIB and SSI, alleging disability dating from October 21, 2020. (Administrative Transcript ("T.") 329-341.)  Her applications were denied initially on April 26, 2021, and her request for administrative reconsideration was denied on September 24, 2021. (T. 95-153.)  Plaintiff's subsequent request for a hearing was granted. (T. 177-178, 188-190.)  On February 18, 2022, Plaintiff, who was represented by counsel, testified by telephone before Administrative Law Judge ("ALJ") Robyn L. Hoffman. (T. 33-72.)  Following the hearing, the ALJ held the record open to receive additional evidence. (T. 70-71.)  On March 14, 2022, Plaintiff amended the alleged onset date to October 5, 2020, based upon additional evidence regarding Plaintiff's psychiatric hospitalization. (T. 77-78, 352-353.)  The ALJ then held a supplemental telephonic hearing on August 25, 2022 to receive the testimony of vocational expert ("VE") Courtney S. Olds. (T. 73-94.)  The ALJ issued an unfavorable decision on September 22, 2022. (T. 7-27.)  The Appeals Council denied Plaintiff's request for review on May 16, 2023. (T. 1-6.)

Plaintiff commenced this proceeding on June 9, 2023 to challenge the Commissioner's denial of disability benefits. (Dkt. No. 1.)

II.    **GENERALLY APPLICABLE LAW**

A.    **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm the ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence.  *Johnson*, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g) (2015); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  To facilitate the court's review, an ALJ must set forth the crucial factors justifying his or her findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010); *see also Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly*, 793 F. Supp. 2d at 630; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citations omitted). Where substantial evidence supports the ALJ's findings they must be sustained "even where substantial evidence may support the plaintiff's positions and despite that the court's independent analysis of the evidence may differ from the [ALJ's]." *Rosado*, 805 F. Supp. at 153. In other words, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

**B.    Standard for Benefits[1]**

To be considered disabled, a plaintiff-claimant seeking benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff-claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id*. § 1382c(a)(3)(B).

---

[1]  The requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3) and Title II, 42 U.S.C. § 423(d), are identical, so that "decisions under these sections are cited interchangeably." *Donato v. Sec'y of Health and Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social

Security Administration ("SSA") promulgated regulations establishing a five-step sequential

evaluation process to determine disability. 20 C.F.R. § 416.920(a)(4) (2015).  Under that five-

step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments;  (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments;  (4) based on a "residual functional capacity"
> assessment, whether the claimant can perform any of his or her
> past relevant work despite the impairment; and (5) whether there
> are significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).  "If at any step a finding of disability or

non-disability can be made, the SSA will not review the claim further."  *Barnhart v. Thomas*,

540 U.S. 20, 24 (2003).

## III.   **FACTS**

On her alleged onset date, Plaintiff was 32 years old. (T. 37-38, 329.)  Plaintiff attended

regular education classes in high school and subsequently obtained an associate's degree in

general studies. (T. 42, 80, 537.)  Her employment history includes work for several years as a

grocery store cashier, but Plaintiff reported that she had not worked since 2016 due to her

physical and mental health impairments. (T. 81, 433-440, 537.)

Plaintiff experiences chronic neck pain that radiates into her arms and legs, making it

difficult to look down or turn her head from side to side. (T. 501.)  Plaintiff also has a history of

psychiatric symptoms and substance abuse that predates her amended alleged onset date of

October 5, 2021. (T. 557, 562, 620.)  On that date, Plaintiff began an involuntary hospital

commitment of sixteen days of psychiatric treatment following her arrest for attempting to enter someone's home without permission. (T. 620.)  At the time of her arrest, Plaintiff was homeless. (T. 623.)  Upon her discharge from the hospital, Plaintiff was immediately transferred to a group home and enrolled in outpatient psychiatric treatment. (T. 623-624.)  At the time of her February 2022 hearing, Plaintiff had resided in the group home for a year and a half. (T. 62.)

The record includes Plaintiff's medical and mental health treatment history.  Rather than summarizing the records at the outset, I will refer to the pertinent records during my discussion of Plaintiff's arguments.

## IV.    **THE ALJ'S DECISION**

As an initial matter, the ALJ determined that Plaintiff met the insured status requirements through December 31, 2020. (T. 13.)  Based upon her review of the administrative record, the ALJ next found that Plaintiff had not engaged in substantial gainful activity since October 5, 2020, the amended alleged onset date. (*Id.*)  At step two, the ALJ found that Plaintiff has the following severe impairments: "cervical spine disc narrowing, schizophrenia, unspecified depressive disorder, an anxiety disorder and polysubstance abuse, in remission." (T. 13-14.)

At step three of the evaluation, the ALJ found that Plaintiff's impairments either singly or in combination did not meet or medically equal the severity of a listed impairment, including Listing 1.15 (disorders of skeletal spine resulting in compromise of a nerve root), Listing 12.03 (schizophrenia spectrum and other psychotic disorders), Listing 12.04 (depressive, bipolar and related disorders), and Listing 12.06 (anxiety and obsessive-compulsive disorders). (T. 14-16.)  Next, the ALJ found that Plaintiff could perform medium work with certain non-exertional limitations. (T. 16-19.)  Specifically, she found that Plaintiff was limited to simple, routine and repetitive tasks; should work in a low stress job; should work at goal-oriented work rather than

production pace rate work; and can have only occasional interaction with coworkers, supervisors, and the public. (T. 17-19.)

In making this RFC determination, the ALJ stated that she considered all of Plaintiff's symptoms, and the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529 and 416.929" and Social Security Ruling ("SSR") 16-3p. (T. 16.)  The ALJ further stated that she considered opinion evidence and prior administrative medical findings in accordance with 20 C.F.R. § 404.1520c and 416.920c. (*Id.*)  The ALJ also considered Plaintiff's subjective complaints regarding pain, symptoms, and functional limitations and found that her "statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record . . . ." (T. 18.)

At step four, the ALJ found that Plaintiff was not capable of performing her past relevant work. (T. 19.)  Relying on the VE testimony, the ALJ next found that, during the relevant period, Plaintiff was capable of performing jobs that existed in significant numbers in the national economy. (T. 19-20.)  Thus, the ALJ found that Plaintiff was not disabled from the amended alleged onset date of October 5, 2020 through the date of her decision. (T. 20.)

## V.    ISSUES IN CONTENTION

Plaintiff argues that remand for further administrative proceedings is necessary because the ALJ lacked substantial evidence to support her step three determination that Plaintiff's mental health impairments did not meet or equal Listing 12.03. (Dkt. No. 12 at 9-16; Dkt. No. 15 at 1-5.)  Specifically, Plaintiff argues that the ALJ failed to properly consider the "Paragraph B" criteria applicable to Plaintiff's diagnosed schizophrenia. (*Id.*)  The Commissioner contends that

the ALJ's step three determination and overall disability determination were supported by substantial evidence. (Dkt. No. 14 at 8-15.)

For the reasons set forth below, this Court recommends that Plaintiff's motion for judgment on the pleadings be granted, Defendant's motion for judgment on the pleadings be denied, and this case be remanded to the Social Security Administration for further administrative proceedings to allow further development of the record, proper consideration of the Listing criteria related to Plaintiff's mental health impairments, and reevaluation of the ultimate determination of disability.

## VI.    LEGAL STANDARDS

### A.    Listed Impairments Generally

The Listing of Impairments describes physical or mental impairments considered severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525(a); *see also Pratt v. Astrue*, No. 7:06-CV-0551 (LEK/DRH), 2008 WL 2594430, at *6 (N.D.N.Y. June 27, 2008) ("If a claimant's impairment or combination of impairments meets or equals a listed impairment, the evaluation process is concluded and the claimant is considered disabled ....") (citation omitted).  Plaintiff has the burden of proof at step three to show that her impairments meet or medically equal a Listing.  *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 272 (N.D.N.Y. 2009) (citing *Naegele v. Barnhart*, 433 F. Supp. 2d 319, 324 (W.D.N.Y. 2006)).  "To meet a Listing, Plaintiff must show that her medically determinable impairment satisfies all of the specified criteria in a Listing."  *Rockwood*, 614 F. Supp. 2d at 272 (citing 20 C.F.R. § 404.1525(d)).  "If a claimant's impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify."  *Id.*, 614 F. Supp. 2d at 272 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

Additionally, a court may uphold an ALJ's finding that a claimant does not meet a Listing even where the decision lacks an express rationale for that finding if the determination is supported by substantial evidence. *Id.*, 614 F. Supp. 2d at 273 (citing *Berry,* 675 F.2d at 468).

An ALJ is required to provide an explanation "as to why the claimant failed to meet or equal the Listings, '[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the Listings.' " *Id.* at 273 (quoting *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 52 (W.D.N.Y. 2002)). "[I]t is the ALJ's responsibility ... to build an accurate and logical bridge from the evidence to [his or her] conclusion to enable a meaningful review," and "[t]he Court cannot ... conduct a review that is both limited and meaningful if the ALJ does not state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered." *Loescher v. Berryhill,* No. 16-CV-300-FPG, 2017 WL 1433338, at *3 (W.D.N.Y. Apr. 24, 2017). However, "[a]n ALJ's unexplained conclusion [at step three] of the analysis may be upheld where other portions of the decision and other 'clearly credible evidence' demonstrate that the conclusion is supported by substantial evidence." *Ryan v. Astrue*, 5 F. Supp. 3d 493, 507 (S.D.N.Y. 2014) (citation omitted).

**B.    Listing 12.03 (Schizophrenia Spectrum and Related Psychotic Disorders)**

An individual can meet or equal Listing 12.03 for schizophrenic, paranoid and other psychotic disorders if their severe impairment meets the criteria set forth in either paragraph A and B of that Listing, or paragraph A and C of that Listing, 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.03 (2004). Paragraph A requires medically documented persistence, either continuous or intermittent, of one or more of the following: (1) delusions or hallucinations; (2) catatonic or other grossly disorganized behavior; (3) incoherence, loosening of associations, illogical

thinking, or poverty of content of speech if associated with either blunt, flat, or inappropriate affect; or (4) emotional withdrawal and/or isolation. *Id.*

Paragraph B requires an extreme limitation in one or marked limitations in two of four areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* Paragraph C requires that the mental impairment be "serious and persistent," such that the individual has a "medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least two years duration that has caused more than a minimal limitation of her ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *Id.*

**VII.  THE ALJ'S ANALYSIS OF LISTING 12.03 WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.**

**A.  Summary of ALJ's Analysis of Listing 12.03**

The ALJ's step three determination expressly considered whether Plaintiff's mental health impairments satisfied the "paragraph B" and "paragraph C" criteria of Listing 12.03. (T. 14.)  Although the ALJ did not specifically address the "paragraph A" criteria in her decision, the Court may reasonably assume that the ALJ found Plaintiff to satisfy these criteria for Listing 12.03.  *See Parker v. Comm'r of Soc. Sec.*, No. 18 Civ. 3814 (PAE) (HBP), 2019 WL 6833413,

at *16 n.14 (S.D.N.Y. July 19, 2019) (collecting cases where court assumed the ALJ found that claimant met paragraph A criteria where those criteria were not expressly addressed in decision, and the ALJ considered only paragraphs B and C.)  Such a finding is supported by the record, which provides examples of Plaintiff's delusional thinking and auditory hallucinations, along with medical observation of disorganized thinking or speech and a diagnosis of chronic paranoid schizophrenia. (T. 496, 516, 518, 561, 620-621.)

Addressing "Paragraph B," the ALJ noted that Dr. M. Momot-Baker, the non-examining state agency consultant who reviewed Plaintiff's then-current psychiatric records in April 2021, considered the Paragraph B criteria and opined that Plaintiff had only mild limitations in her ability to understand, remember, and apply information and her ability to interact with others, and moderate limitations in her ability to concentrate, persist and maintain pace and her ability to adapt and manage oneself. (T. 15, 101.)  Dr. J. Ochoa, a non-examining state agency consultant who reviewed Plaintiff's records in September 2022 in response to her request for administrative reconsideration, opined that Plaintiff had moderate limitations in all four categories. (T. 130.) The ALJ reached the same conclusion as Dr. Ochoa and provided an additional narrative supporting no more than moderate limitations in each of the four Paragraph B criteria. (T. 14-15.)

For example, with regard to understanding, remembering, or applying information, the ALJ cited Plaintiff's own reports that she had difficulty following spoken instructions, but could follow written instructions well. (T. 14, 368.)  She also considered Plaintiff's self-report that she could go places and take medication without reminders, coupled with treatment notes from 2020 and 2022 describing grossly intact memory. (T. 14, 365, 367, 518, 695.)

With regard to interacting with others, the ALJ based her assessment of moderate limitations on Plaintiff's self-report that she had no problems getting along with family, friends, neighbors, and others. (T. 14, 367.) The ALJ noted that some mental health evaluations describe Plaintiff as "irritable with poor eye contact" but others depict her as cooperative with an improved ability to engage in conversation as she progressed in treatment. (T. 14, 513, 518, 699.)

In the area of concentration, persistence, and pace, the ALJ found that moderate limitations were consistent with treatment records describing Plaintiff as exhibiting intact attention and concentration. (T. 14, 513, 525, 695.) The ALJ also cited Plaintiff's April 2021 psychiatric consultative examination results showing coherent and goal-directed thought processes, along with intact attention and concentration. (T. 14, 497.) The ALJ also relied upon Plaintiff's self-assessment that she did not have problems paying attention and was able to finish what she started. (T. 14, 368.)

Finally, with regard to adapting or managing oneself, the ALJ recognized that Plaintiff had "some history of psychotic behavior" but based her finding of moderate limitations on more recent records describing "intact" or "adequate" impulse control and judgment as Plaintiff progressed with her psychiatric treatment. (T. 15, 513, 549, 554, 621, 692, 695.) The ALJ also recognized Plaintiff's expressed difficulties with handling changes in routine. (T. 15, 369.)

**B. Remand is Recommended Because the ALJ's Analysis of the Paragraph B Criteria for Listing 12.03 is Not Supported by Substantial Evidence.**

Plaintiff contends that the ALJ's step three analysis overlooks or ignores record evidence suggestive of greater restrictions and argues that the ALJ should have found at least "marked" limitations in Plaintiff's ability to understand, remember, or apply information, her ability to interact with others, and her ability to adapt or manage herself. (Dkt. No. 12 at 13-16.) This

Court agrees with Plaintiff that the ALJ made a series of errors in evaluating the Paragraph B criteria in connection with Listing 12.03 that calls her finding of moderate limitations into doubt. Therefore, I recommend remand for further consideration of the mental health Listings and further development of the record as necessary, particularly with regard to documentation related to Plaintiff's discharge to and continued residence at a group home.

One error of particular significance and potential harm to Plaintiff is the ALJ's minimal consideration of Plaintiff's extended psychiatric hospitalization in October 2020. For reasons that are unclear, the records associated with this period of involuntary commitment were not provided to the ALJ until nearly a month after the administrative hearing. (T. 352, 618-637.) The delayed inclusion of these records made them unavailable to Dr. Momot-Baker or Dr. Ochoa, the state agency consultants cited by the ALJ at step three. Overall, the ALJ's step three analysis makes only passing reference to these hospital records, describing "some inpatient treatment including a hospitalization" and "some history of psychotic behavior." (T. 13, 15.)

These hospital records merited greater examination from the ALJ because they document Plaintiff's emergency psychiatric care in late 2020 as well as her discharge to and extended residency in a group home with some level of structured support. October 2020 records show that the police took Plaintiff to the emergency room when she exhibited psychotic symptoms following her arrest for unlawful entry into someone else's home. (T. 43-45, 620.) Hospital staff were familiar with Plaintiff, who had previously received emergency psychiatric treatment and was described as "a problem in the community . . . with frequent police involvement." (T. 621, 623.) Intake notes describe Plaintiff's behavior as "cooperative . . . but what she says is full of delusions." (T. 621.) For example, Plaintiff informed medical staff that that she was pregnant and was only at the hospital for a broken arm. (T. 621, 623.) Neither of these was true. Plaintiff

13

was involuntarily committed for psychiatric treatment under state law, with such care deemed "Medically Necessary" due to "Continued symptoms of major mental illness and Unable to care for self." (T. 621-622.)  Emergency room staff also reported that Plaintiff "drank her own urine in the ER." (T. 622.)

During her sixteen day psychiatric hospitalization, Plaintiff had violent altercations with other patients in two separate incidents before becoming more stable with medication. (T. 623.) Hospital staff reported that Plaintiff's "level of delusions decreased significantly" but "there was no significant improvement of her insight." (*Id*.)  Discharge notes show that a hospital social worker "was able to put supports in place" including placement in a group home. (T. 623-624.) The discharging physician opined that there was "nothing further that could be done for her and it was decided to try her again as an [outpatient].  She was not seen as an imminent risk to harm self/others at that time." (T. 624.)

Outpatient treatment notes reflect continued disruptive psychiatric symptoms.  In November 2020, a treating mental health nurse practitioner found it difficult to gather intake information because Plaintiff was "making nonsensical statements" with no recollection of the events leading up to her hospitalization. (T. 519.)  Plaintiff was diagnosed with "moderate to severe" psychosis. (T. 549.)  During follow-up appointments, Plaintiff often gave one-word answers that offered little insight into her thought process. (T. 523, 526.)  As Plaintiff progressed in treatment, her ability to engage in conversation improved, but treatment notes still reflect ongoing struggles with anxiety, depression, and an inability to handle stress. (T. 524, 548, 699.) In June 2021, Plaintiff reported that she was "good for the most part" with her anxiety and depression symptoms largely controlled by medication, but she still displayed only "fair"

judgment and "limited insight." (T. 554.)  By February 2022, Plaintiff reported an increase in her anxiety and depression, along with nightmares. (T. 697-698.)

In determining that Plaintiff had only moderate limitations in her ability to understand, remember, or apply information, the ALJ relied almost exclusively on Plaintiff's own assessment of her symptoms as set out in the Function Report prepared with her DIB and SSI applications. (T. 14-15, 363-371.)  This approach appears questionable, because the ALJ did so without expressing any consideration for multiple treatment notes describing Plaintiff as an unreliable historian about her physical and mental impairments, even after Plaintiff's delusions were brought under control with medication. (T. 526, 561, 563, 620-621, 623, 626, 644.).

Similar issues impact the ALJ's finding of moderate limitations in Plaintiff's ability to interact with others. (T. 14.)  The ALJ appears to have taken Plaintiff's statement that she "does not have problems getting along with family, friends, neighbors or others" at face value. (T. 14, 367.)  The ALJ reached this conclusion without any discussion of record evidence describing Plaintiff as "a problem in the community . . . with frequent police involvement;" her history of arrests for theft, unlawful entry, and property damage; an order of protection that prevented Plaintiff from contacting her parents for an extended period; and treatment notes documenting Plaintiff's restriction to individual therapy sessions after she had physical altercations with other patients during group sessions. (T. 352, 524, 553, 562-563, 572, 623.)  Addressing family interaction specifically, therapy notes and Plaintiff's testimony depict a more difficult relationship with her parents and siblings than described by the ALJ.[2] (T. 45, 563, 566, 572.)

_____

[2] Plaintiff's February 2022 hearing testimony about her family further supports the notion of Plaintiff as an unreliable historian.  Plaintiff testified that her October 2020 involuntary commitment resulted from stress due to a fight with her parents, but the contemporaneous treatment notes describe Plaintiff's arrest for entering strangers' apartments thinking it was her

The ALJ's minimal analysis at step three also impacts the Court's ability to evaluate her finding that Plaintiff has moderate limitations in adapting and managing herself. This broad functional area refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. 20 C.F.R. § 404, Subpart P, App'x 1, § 12.00(E)(4). When evaluating this area, an ALJ should typically consider whether an individual requires support structures for daily activities or has other difficulties functioning independently. *See Vogelsang v. Comm'r of Soc. Sec.*, 657 F. Supp. 3d 450, 466–67 (S.D.N.Y. 2023) (remanding where ALJ did not consider evidence that plaintiff required assistance with daily tasks and was unable to live independently before finding moderate limitations in adaptation and managing oneself); *Tammy T. v. Kijakazi*, No. 5:21-CV-1, 2022 WL 71995, at *11 (D. Vt. January 7, 2022) (remanding where ALJ's finding of moderate limitations in adapting and managing oneself did not consider Plaintiff's inability to independently perform activities of daily living); *Kelly Ann C. v. Saul*, No. 18-CV-468 (DJS), 2019 WL 3321923, at *4 (N.D.N.Y. July 24, 2019) (finding substantial evidence supporting ALJ's assessment of mild limitations adapting and managing oneself where the plaintiff was able to "handle self-care and personal hygiene and prepare meals, pay bills, go to doctors' appointments, take medications, shop, and read").

Despite making a vague reference to Plaintiff's "history of psychotic behavior," the ALJ's analysis of this functional area relied almost entirely upon Plaintiff's most recent mental health evaluations, all conducted by telephone or videoconference, showing "adequate" impulse control and a general improvement in symptoms with treatment. (T. 15, 513, 548-556, 695.) In doing so, the ALJ excluded any discussion of evidence bearing on Plaintiff's ability to function

---

home. (T. 45, 519, 622.) Plaintiff may be confusing this incident with an earlier arrest for breaking a window at her parents' home in September 2019. (T. 561-562.)

independently, such as (1) a period of homelessness, (2) the arrest that led to her involuntary psychiatric commitment in October 2020, and (3) her discharge to and continued residence at a group home. (T. 15, 519, 563, 620, 622, 624.)  This last omission, regarding Plaintiff's continued residence at a group home, is the most glaring error regarding Plaintiff's ability to manage herself independently.

The available record strongly suggests that the group home structures Plaintiff's activities of daily living and monitors her compliance with prescribed medication and other treatment.  For example, Plaintiff's October 2020 hospital discharge report notes that a social worker was able to "put supports in place including referral to [the group home] where they have a bed for her." (T. 623-624.)  December 2020 outpatient treatment notes include a mandatory evaluation for substance abuse counseling as a condition of Plaintiff's residency at the group home. (T. 466.)  Over the course of her treatment, multiple mental health providers included compliance with the group home's rules as one of Plaintiff's treatment goals. (T. 473, 551.)  None of this evidence was discussed by the ALJ.

As this Court previously noted, Plaintiff has often been considered an unreliable historian regarding her medical history.  Still, her February 2022 hearing testimony describing her living environment is generally consistent with the available record. (T. 41-42, 59-64.)  Plaintiff testified that she and eight other individuals resided at the group home, accompanied by staff who did not live onsite. (T 41-42.)  The ALJ solicited the following relevant testimony from Plaintiff:

> Q:      All right.  Let me ask some more questions then.  I want to ask, you're in this group home right now.  When did you start living there?
>
> A:      October of 2020.

Q:      Okay.

A:      I got out of jail and I got here three days after - - or right after Halloween I came.

Q:      All right.  So, you have been in this group home setting since October of 2020.  Is that correct?

A:      Yes.

Q:      Do, tell me about, what are some of the services that is being provided in this group home for you?

A:      They show me how to cook, they show me how to clean, they help me with my appointments.  **If I have an appointment, they figure out a way how to get there**.  They encourage me to exercise.  They are very supportive.  We have this thing right now that if we do something nice or if we clean our - -  we have to do a chore once a - - every day for a week . . . .

Q:      And does anybody make, whether there's a change in this, let me know, but in the two years that you've been there, does anybody make your meals for you or have you been responsible for . . . your own meal preparation the whole time?

A:      Mostly we're responsible for our own meals.  They help us do some of the stuff.  If we need help, they say, you can ask for help.

Q:      Okay.  And, you know, some of the reasons I'm asking this is because you had that court ordered in-patient hospitalization, and then you went right to this home.  So I'm just trying to get a sense of how restrictive this home setting is.  Who's in charge of deciding when, if at all, you get discharged from this group home?

A:      I don't know.  I've been here for over a little over a year and a half, and I like it here, it's really nice.  And I don't want to leave because that wouldn't be good for me.  **I like how - - they restrict, like, certain things.  Like they don't let me go do certain stuff.  Like if they think that it's something that I shouldn't be doing, then they don't allow it**.  So it's like, you know, it works well with me, it's fine with me, because I like that.  I like to be able to have like where if somebody tells me, no, I can't do that . . .

Q:      **But do they monitor where you're going or when you go?**

A:      **Yes. Yep.**

18

Q:      So, what do you have to do?

A:      **They want to know who you're going with, how long you're going to be gone for, what you're doing.**

Q:      **And do they distribute your medication to you?**

A:      **Yes.**  Yep.  Twice a - - I take my meds usually twice a day.

Q:      But it's not something you have in your own room.  They give the medication to you - -

A:      No.

Q:      - - and you take the medication?

A:      Right.  Yep.

Q:      Do they check to make sure you took the medication?

A:      Yes, we have a little cup that we have and **they look and see, make sure that we took the meds that we are supposed to take**. . . .

Q:      **Do they have any restrictions - - are you allowed to drink alcohol at the group home?**

A:      **No. No.**

Q:      Are you allowed to leave there?  **Do they monitor whether or not you've drunk alcohol if you go somewhere that's not as a group?**

A:      **Yes.  Yep.**

(T. 59-63.)  (emphasis added)

The highlighted testimony suggests to the reasonable observer that Plaintiff's long-term residence in a group home provides her several structural supports in areas where she may have difficulty functioning independently.  These supports include restrictions on her activities of daily living and monitoring of her psychiatric medication that are potentially inconsistent with

19

the ALJ's finding of moderate limitations in adapting and managing oneself, and thus merited further inquiry by the ALJ.

In addition, correspondence in the record indicates that the group home denied Plaintiff's counsel's request for documentation confirming Plaintiff's living arrangements. (T. 441.) Plaintiff's counsel informed the ALJ of the denial but did not request that the ALJ intervene by subpoena or otherwise. (T. 352, 441.)  Even without a formal request, the ALJ had an obligation to make "every reasonable effort" to fully and fairly develop the record, including potential use of her subpoena power to obtain the group home's records.  *Harris o/b/o N.L.K. v. Berryhill*, 293 F.Supp.3d 365, 369 (W.D.N.Y. 2018) ("The fact that the essential treatment records were requested, but not received, 'does not obviate the ALJ's independent duty to develop the record,' particularly since the ALJ could have exercised his power to subpoena them.").  The record shows no attempt by the ALJ to obtain any records related to the support structures in place at Plaintiff's group home, compounding the ALJ's error and providing further grounds for recommending remand to allow for a reliable determination related to the Paragraph B criteria for Listing 12.03.

The Commissioner correctly asserts that the ALJ "need not recite every piece of evidence that contributed to the decision." *Cichocki v. Astrue*, 729 F.3d 172, 178, n.3 (2d Cir. 2013).  It is also true an ALJ is not required, in every instance, to provide an express explanation for concluding that a claimant's impairments fail to meet or equal the requirements of a Listing. *See Jonisha M. G. v. Comm'r of Soc. Sec.,* No. 5:22-CV-1412 (TWD), 2024 WL 1219696, at *5 (N.D.N.Y. Mar. 21, 2024) (collecting cases).  Still, an ALJ must "build an accurate and logical bridge from the evidence to her conclusion to enable a meaningful review." *Pamela P. v. Saul*, No. 3:19-CV-575 (DJS), 2020 WL 2561106, at *4 (N.D.N.Y. May 20, 2020) (quoting *Steele v.*

*Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)).  That bridge is lacking here, due to the amount of omitted evidence suggestive of greater than moderate limitations in Plaintiff's ability to understand, remember, or apply information, interact with others, and adapt or manage herself. *See Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *15 (S.D.N.Y. Aug. 6, 2021) ("where there is record evidence that appears to support a conclusion that most or all of the elements of a Listing are met, an ALJ must explain why a claimant's condition does not satisfy the Listing.); *Kuleszo v. Barnhart*, 232 F. Supp.2d 44, 52 (W.D.N.Y. 2002) ("Where the claimant's symptoms, as described by the medical evidence, appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings").  Therefore, this Court recommends remand for further administrative proceedings.

### C.  Plaintiff Waived Any Argument that the ALJ's Analysis of the Paragraph C Criteria for Listing 12.03 Provided Additional Grounds for Judicial Remand.

This Court notes that the ALJ discussed Plaintiff's own description of her living situation as part of her "paragraph C" analysis, but appears to have misrepresented Plaintiff's testimony, in finding that "[t]here are no apparent[] restrictions nor tasks performed for her" at the group home. (T. 15.)  Still, this Court agrees with the Commissioner's argument that Plaintiff has not raised any specific challenge to the Paragraph C analysis. (Dkt. No. 12 at 12-16; Dkt. No. 14 at 10; Dkt. No. 15 at 1-5.)  Therefore, any argument related to the Paragraph C criteria is waived, and the District Court need not consider whether the ALJ's Paragraph C analysis presents independent grounds for remand.  *See* N.D.N.Y. General Order 18 at ¶ C(1)D ("The issues before the Court are limited to the issues properly raised in the briefs."); *see also Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("It is not the obligation of this Court to

research and construct the legal arguments available to the parties . . . To the contrary,

perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent

authority, are deemed waived.")  However, proper consideration of the Paragraph B criteria will

necessarily involve some further development of the record and consideration of new

documentary or testimonial evidence pertaining to Plaintiff's group home residency. Therefore,

the Paragraph C criteria, the ALJ's RFC determination, and the ultimate disability determination

would all still have to be revisited at the administrative level if the District Court agrees with the

recommendation to remand.

     **ACCORDINGLY**, it is

     **RECOMMENDED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 12)

be **<u>GRANTED</u>**; Defendant's motion for judgment on the pleadings (Dkt. No. 14) be **<u>DENIED</u>**

and that the matter be **<u>REVERSED AND REMANDED</u>** to the Commissioner pursuant to

sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and

Recommendation.

     Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written

objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE**

**APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v.*

*Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72.

Dated:   June 11, 2024
        Binghamton, NY

Miroslav Lovric
U.S. Magistrate Judge